United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 27, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 04-50335
_____

JUSTICE FOR ALL; JEREMY ALDER; A.E. SMITH,

Plaintiffs - Appellees,

versus

LARRY FAULKNER, Dr., individually and in
his official capacity as President of the
University of Texas at Austin; MARK YUDOF,
individually and in his official capacity
as Chancellor of the University of Texas
System; CULLEN M. GODFREY, individually and
in his official capacity as Vice-Chancellor
of the University of Texas System; JAMES W.
VICK, Dr., individually and in his official
capacity as Vice President for Student Affairs
of the University of Texas at Austin; JOE
A. POWELL, individually and in his official
capacity as Associate Vice President of the
Employee and Campus Services of the University
of Texas at Austin; TERESA GRAHAM BRETT,
individually and in her official capacity as
Associate Vice President of Student Affairs and
Dean of Students of the University of Texas at
Austin; CHERYL WOOD, individually and in her
official capacity as Senior Student Affairs
Administrator of the University of Texas at
Austin; JEFFERY VAN SLYKE, individually and
in his official capacity as Police Chief of the
University of Texas at Austin Police Department;
CHARLES MILLER, individually and in his official
capacity as Chairman of the Board of Regents of
the University of Texas System; RITA C. CLEMENTS,
individually and in her official capacity as the
Vice Chairman of the Board of Regents of the
University of Texas System; WOODY L. HUNT,
individually and in his official capacity as the
Vice Chairman of the Board of Regents of the
University of Texas System; FRANCIE A. FREDERICK,
individually and in her official capacity as
Counsel and Secretary of the Board of Regents of
the University of Texas System; ROBERT A. ESTRADA,

individually and in his official capacity as a member of the Board of Regents of the University of Texas System; JUDITH L. CRAVEN, Dr., individually and in her official capacity as a member of the Board of Regents of the University of Texas System; CYNDI TAYLOR KRIER, individually and in her official capacity as a member of the Board of Regents of the University of Texas System; H. SCOTT CAVEN, JR., individually and in his official capacity as a member of the Board of Regents of the University of Texas System; JAMES RICHARD HUFFINES, JR., Dr., individually and in his official capacity as a member of the Board of Regents of the University of Texas System; JOHN W. BARNHILL, individually and in his official capacity as a member of the Board of Regents of the University of Texas System,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Western District of Texas
_____

Before JOLLY, DAVIS, and CLEMENT, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The University of Texas at Austin ("the University") is the flagship campus of the University of Texas System. Justice For All ("JFA") is a student anti-abortion group at the University. JFA brought this action challenging the University's "Literature Policy", which requires that all printed materials distributed on campus bear the name of a university-affiliated person or organization responsible for their distribution. JFA contends that the policy is an unconstitutional restriction on anonymous speech in a designated public forum. The University responds that the policy is a reasonable, viewpoint-neutral regulation of speech

2

within a limited public forum.  The district court agreed with JFA, and issued a permanent injunction barring enforcement of the Literature Policy to prevent JFA from engaging in anonymous leafleting.

We AFFIRM the district court's holding that the Literature Policy is invalid under the First Amendment.  As to the specific remedy ordered, however, we REMAND for further consideration consistent with this opinion.

I

In December 2000, and again in February 2001, JFA submitted to the University's Dean of Students an "Application for Use of University Facilities" requesting permission to erect a 5600 square foot photographic exhibit on the University's Main Plaza.  The University denied the requests, but gave JFA permission to erect the exhibit elsewhere on campus on two occasions.

JFA alleges that, during one of the displays, University officials attempted to prohibit its members from handing out leaflets.  The leaflets in question read, simply, "Life is Beautiful -- Choose Life".  Although neither party expressly states as much, it is clear that the intervention occurred solely because the leaflets did not identify JFA as the organization responsible for their distribution, as is required by the University's Literature Policy.

As a result of the incident, JFA brought this action, challenging various University policies on First Amendment grounds.

In response, the University amended or repealed some of the policies in question, leaving two claims for the district court to resolve. One of the two, which challenged the University's rules regarding the erection of stationary exhibits on campus, was dismissed by the district court. JFA does not appeal the dismissal.

The second of JFA's two claims challenged the Literature Policy as an unconstitutional restriction on anonymous speech within a designated public forum. The Literature Policy is actually comprised of two discrete rules: Institutional Rule § 13-404 and Regents Rule § 12. Regents Rule § 12 applies generally to the University of Texas System and provides that "[a]nonymous publications are prohibited, and any individual or organization publishing or aiding in publishing, or circulating or aiding in circulating, an anonymous publication will be subject to disciplinary action". Institutional Rule § 13-404 implements the Regents Rule on the Austin campus, and states that "all literature distributed on campus must identify the University person or organization[1] responsible for its distribution".[2]

---

[1] The term "university person or organization" refers to registered student, faculty, or staff organizations, and individual students, faculty members, or staff members. Under § 13-103 of the Institutional Rules, all other persons and organizations are deemed "off-campus persons or organizations".

[2] We would also emphasize what is not under review in this case. JFA has not challenged provisions in the Institutional Rules requiring individuals and groups to identify themselves on signs posted on University kiosks (§ 13-503(d)) or departmental bulletin

4

The University has advanced several justifications for the Literature Policy. Before the district court, it argued, _inter alia_, that the policy was enacted to prevent littering on campus. On appeal, the University has abandoned the anti-littering rationale and contends that the Literature Policy ensures that literature is not distributed by non-affiliated individuals or groups, thus preserving the campus for use by students, faculty, and staff.

The district court concluded (1) that "the campuses of public colleges and universities" are "designated public forums for student expression" and (2) that the University's Literature Policy was not narrowly tailored to serve a significant state interest.[3] As such, it granted summary judgment for JFA and permanently enjoined the University from enforcing the Literature Policy "to prevent Plaintiffs from engaging in anonymous leafletting". The University now appeals that decision.

II

JFA contends that the Literature Policy violates the First Amendment, insofar as it effectively bars anonymous leafleting by students on the campus of a public university. Before turning our

boards (§ 13-506(b)). As noted in the district court order, what is at issue here is the "distribution" of literature —- i.e., the physical handing out of leaflets and other materials.

[3] The substantive analysis in this case was done, quite ably, by Magistrate Judge Austin. Because the district court adopted the findings and recommendations of the magistrate in full, we refer to them as being those of the district court.

attention to the Literature Policy itself, we must address two threshold questions. First, we must determine whether the speech at issue -- that is, anonymous leafleting -- is protected under the First Amendment. If it is, we must determine the proper level of constitutional scrutiny to apply to the particular forum in question.

A

As a general proposition, anonymous speech is protected by the First Amendment. See, e.g., McIntyre v. Ohio Elections Comm'n., 514 U.S. 334 (1995); Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182, 199-200 (1999); Talley v. California, 362 U.S. 60, 64 (1960). In striking down prohibitions on anonymous publication, the Supreme Court has noted, inter alia, the importance of anonymity as a means of permitting "[p]ersecuted groups and sects" to "criticize oppressive practices and laws". Talley, 362 U.S. at 64.

More specifically, the First Amendment's protection of anonymous speech extends beyond traditional publishing to encompass anonymous leafleting. In Talley, for example, the Supreme Court held void a city ordinance barring the distribution of handbills that did not include the name and address of both the author and distributor. See id. at 60-61, 65. Moreover, the Court observed in McIntyre that "anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and

6

dissent", which "exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular".  514 U.S. at 357.

Certainly, the right to "anonymous speech" has a somewhat different meaning for a student who speaks on the campus of a public university than it has for a leafleter on a public street. Public universities can and typically do restrict access to campus facilities.  Identifying oneself as a student to a designated university official will often serve as one's "admission ticket" to use those facilities for various purposes, including speech.  As such, on-campus speech -- by virtue of the simple fact that it occurs within a forum that only certain persons may use -- will almost never be completely anonymous.

What remains of a student's anonymity after he has identified himself to university officials, however, is significant.  He may, if he chooses, remain anonymous in relation to other students, as well as most faculty and staff.  This residual anonymity is no less critical to the expression of controversial ideas on university campuses than the right to more complete anonymity is to such expression in traditional public spheres.  As such, we have no trouble concluding that the anonymous leafleting prohibited by the Literature Policy is a form of speech protected under the First Amendment.

B

We thus proceed to determine what level of First Amendment scrutiny to apply in our review of the Literature Policy.  The

7

policy is a restriction on speech on government-owned property --
i.e., the campus of the University of Texas at Austin. The
standards by which regulations of speech on government property
must be evaluated "differ depending on the character of the
property at issue". See Perry Education Assn. v. Perry Local
Educators' Assn., 460 U.S. 37, 44 (1983). As such, our analysis
turns on how the University's campus is classified as a forum for
protected speech under the Supreme Court's precedents.

Broadly speaking, there are three types of forum for purposes
of First Amendment scrutiny: traditional, nonpublic, and
designated. See id. at 44-46. Restrictions on speech in
traditional public forums, such as streets and parks, receive the
strictest scrutiny.[4] Restrictions in nonpublic forums, such as
military installations, receive the most forgiving.[5] The campus of
the University of Texas at Austin, however, fits neither category.
It falls instead within the middle category, broadly referred to as
"designated" public forums.

In recent years, the Supreme Court has made it clear that this
middle category is further divided into two discrete types of
forum: true "designated" forums and "limited" forums.[6] The

---

[4] See, e.g., Carey v. Brown, 447 U.S. 455, 461 (1980).

[5] See, e.g., Greer v. Spock, 424 U.S. 828 (1976).

[6] Although the Supreme Court and the circuits have clarified
the functional difference between designated and limited forums,
the precise taxonomic designation of the latter remains elusive.
As we observed in Chiu v. Plano Independent School District, 260

distinction is critical in this case, because restrictions on speech in a designated forum are subject to strict scrutiny, whereas such restrictions in a limited forum are reviewed under a less demanding standard for "reasonableness". See Chiu, 260 F.3d at 346; see also Rosenberger, 515 U.S. at 829.[7]

In Chiu, this court set forth a two-factor test for classifying such intermediate public forums as either designated or limited. Under Chiu, we look to "(1) the government's intent with respect to the forum, and (2) the nature of the forum and its compatibility with the speech at issue". 260 F.3d at 346. As a preliminary matter, however, we note that there is some dispute between the parties as to the precise nature of the "forum" at issue in this case. As such, before applying the Chiu test, we must define the parameters of the forum.

1

---

F.3d 330, 346 n. 10 (5th Cir. 2001), the Supreme Court at one time "referred to limited public forums as being a subcategory within a designated public forum", but had more recently "used the phrase 'limited public forum' to describe a type of nonpublic forum of limited open access". Compare Widmar v. Vincent, 454 U.S. 263, 273-74 (1981) with Rosenberger v. Rector & Visitors of the Univ. of Virginia, 515 U.S. 819, 829 (1995).

[7] In Rosenberger, the Supreme Court reviewed speech restrictions in a "limited forum" only (1) for viewpoint neutrality; and (2) to determine whether the restriction was "reasonable in light of the purpose served by the forum". 515 U.S. at 829. This standard is identical to that which the Court has applied to nonpublic forums. See, e.g., Perry Education Assn., 460 U.S. at 49.

The University's case is based on a general assertion that "the University campus" is a limited public forum. The University suggests that to hold otherwise would render the entire campus "the equivalent of a public park", insofar as any regulation of speech by "students, teachers, or anyone else" would be subject to strict scrutiny. Moreover, the University notes that it affirmatively prohibits speech by "off-campus persons or organizations" -- i.e., anyone who is not a student, faculty member, or staff member -- and contends that the district court's order, if upheld, would undermine its ability to do so. The University's arguments do not reflect an appreciation of the distinction between limited and designated public forums as they exist within the university property.

The distinction between limited and designated public forums is not a simple "all-or-nothing" proposition. The Supreme Court's forum analysis jurisprudence does not require us to choose between the polar extremes of treating an entire university campus as a forum designated for <u>all</u> types of speech by <u>all</u> speakers, or, alternatively, as a limited forum where any reasonable restriction on speech must be upheld.[8] Instead, as the Supreme Court indicated

---

[8] More generally, we note that a central function of the limited/designated dichotomy has been to permit courts to strike a balance between "the necessit[y] of confining a forum to the limited ... purposes for which it was created" and the requirement that the state, once it has opened a forum, "respect the lawful boundaries it has itself set". <u>Rosenberger</u>, 515 U.S. at 829 (citing <u>Cornelius v. NAACP Legal Defense and Education Fund, Inc.</u>, 473 U.S. 788, 804-06 (1985)); <u>see</u> <u>also</u> <u>Perry Education Assn.</u>, 460

in <u>Arkansas Public Television Assn. v. Forbes</u>, a given forum may be designated for one class of speaker or speech, and still "limited" with respect to others.[9]  <u>See</u> 523 U.S. 666, 677-81 (1998) ("If the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny.").

As such, the University's concern that an adverse holding must necessarily throw open the gates of public universities to any type of speech by any speaker is unfounded.  We are not called upon in this case to decide whether the University of Texas at Austin has opened its entire campus to unfettered expression by the general public.  Instead, our task is simply to determine whether outdoor open areas of the University's campus, accessible to students generally, have been designated as a forum for <u>student</u> expression. We now proceed with that inquiry.

2

We turn, then, to the first element of the <u>Chiu</u> test:  the government's intent with respect to the forum.  Government intent

---

U.S. at 46-48.  Such a balancing would be largely impossible were the designated/limited dichotomy to be treated as a simple binary choice to be made at a facility-wide (here, campus-wide) level.

[9] This court has drawn similar distinctions in its own case law. In <u>Chiu</u>, for example, we noted that "when school district authorities elect to open public school facilities after school hours for public meetings during which public issues will be discussed in a manner similar to a limited-topic school board meeting, the district officials have designated a public forum <u>for the limited time and topic of the meeting</u>". <u>See</u> <u>Chiu</u>, 260 F.3d at 348 (emphasis added).

11

represents "the critical starting point" of forum analysis, as "the government creates a designated public forum 'only by intentionally opening a nontraditional forum for public discourse'". Chiu, 260 F.3d at 347 (quoting Cornelius, 473 U.S. at 805).

The University contends that, by enforcing a "pervasive and comprehensive ... system" of speech regulations, it has demonstrated an intent to establish its campus as a limited public forum. The general thrust of these regulations is summarized in § 6.1 of the Regents Rules, which provides that:

> The property, buildings, or facilities owned or controlled by the U.T. System or component institutions are not open for assembly, speech, or other activities as are the public streets, sidewalks, and parks. The responsibility of the Board of Regents to operate and maintain an effective and efficient system of institutions of higher education requires that the time, place, and manner of assembly, speech, and other activities on the grounds and in the buildings and facilities of the U.T. System or component institutions be regulated.

The Institutional Rules implement the general directives of the Regents Rules on the Austin campus. Chapter 13 of the Institutional Rules, entitled "Speech, Expression, and Assembly", begins by guaranteeing the expressive rights of students, faculty, and staff. Subchapter 13-100 provides the following "Governing Principles":

> a.   The freedoms of speech, expression, and assembly are fundamental rights of all persons and are central to the mission of the University. Students, faculty, and staff have the right to assemble, to

12

speak, and to attempt to attract the attention of others, and corresponding rights to hear the speech of others when they choose to listen, and to ignore the speech of others when they choose not to listen.

b. Students, faculty and staff are free to express their views, individually or in organized groups, orally or in writing or by other symbols, on any topic, in all parts of the campus, subject only to rules necessary to preserve the equal rights of others and the other functions of the University. ...

The Institutional Rules "preserve ... the other functions of the University" primarily by designating appropriate locations, times and/or procedures for the use of, <u>inter</u> <u>alia</u>, signs, banners, kiosks, tables, "exhibits", and amplified sound. They are, as Regents Rule 6.1 suggests, generally the sort of "time, place, and manner" regulations that might be enforced in any public forum -- designated, traditional, or otherwise.[10]

In contrast to its relatively comprehensive regulation of the time, place, and manner of speech, the University imposes only minimal restrictions on the substance of speech. Section 13-101(c) of the Institutional Rules provides that "[e]xcept as expressly authorized by subchapter 13-200, the University shall not discriminate on the basis of the political, religious,

_____

[10] In traditional public forums, "[t]he state may ... enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." <u>See</u>, <u>e.g.</u>, <u>Chiu</u>, 260 F.3d at 345 n.9 (<u>quoting</u> <u>Perry Education Assn.</u>, 460 U.S. at 45).

13

philosophical, ideological, or academic viewpoint expressed by any person".  Notably, subchapter 13-200 prohibits only obscenity, defamation, harassment, commercial solicitation, and incitements to violate the law, all of which reflect distinctions as to content, rather than viewpoint.  Moreover, Section 13-305(b) provides that "even [the] rules [set forth in Chapter 13] are subject to the constitutional right of free speech" and as such, "must be viewpoint neutral".

Thus, the University's Institutional Rules mandate that any substantive restrictions on student speech -- at least in open, outdoor portions of the campus -- must be both (1) viewpoint neutral and (2) content neutral, unless one of a small number of expressly delineated exceptions applies.[11]  Put another way, although the University's restrictions on the time, place, and manner of speech are indeed "comprehensive", it has nonetheless affirmatively and expressly guaranteed its students, faculty, and

---

[11] As further evidence of its intent to establish a limited forum, the University points to provisions within the Regents Rules that deny the above-described protections to non-affiliated individuals and organizations -- i.e., the general public.  We agree that the Regents Rules evince a clear intent on the part of the University of Texas System to restrict the public's right to speak on its campuses.  The Literature Policy, however, does not apply to the general public; it applies solely to university-affiliated individuals and groups.  As noted supra, the narrow question before us is whether the University has sufficiently demonstrated an intent to limit speech by the affected class -- i.e., students, faculty, and staff.  The exclusion of other classes is not relevant to that inquiry.

14

staff virtually all of the rights that the Constitution provides speakers in traditional public spaces.

The University's regulations are not materially different -- at least, with regard to their treatment of student speech[12] -- from those that we reviewed in <u>Hays County Guardian v. Supple</u>, 969 F.2d 111 (5th Cir. 1992). In <u>Hays County Guardian</u>, we considered an earlier version of the Regents Rules, which, much like the current Institutional Rules, guaranteed students the right to "assemble and engage in free speech" subject to "reasonable nondiscriminatory regulations as to time, place, and manner of such activities". <u>Id.</u> at 117. We observed that the Regents Rules "support the conclusion that the University intended the campus to serve as a public forum for its students" and held that the campus was a "limited public forum, designated for the speech of students".[13]

The Institutional Rules, like the regulations in <u>Hays County Guardian</u>, clearly evince an intent to maintain the Austin campus as a designated forum for student expression, subject only to time,

---

[12] The version of the Regents Rules we considered in <u>Hays County Guardian</u> extended the right to speak on campus to "[a]ny group or person, whether or not a student or employee". <u>See</u> 969 F.2d at 117.

[13] The University contends that the district court erred in relying on <u>Hays County Guardian</u>, observing that the case "predated the recent clarification" of the distinction between designated and limited forums. The argument is without merit. Although the designated versus limited distinction has been clarified to an extent in recent years, the court in <u>Hays County Guardian</u> reached precisely the same result it would reach today -- i.e., that regulations of student speech on campus were subject to strict scrutiny -- based on essentially the same substantive analysis.

place, and manner regulations and a small number of enumerated content-based restrictions.  In short, the University has given its students too broad a guarantee of expressive freedom now to claim it intended its campus to function as a limited public forum.

We turn then, briefly, to the second element of the <u>Chiu</u> test: the compatibility of the speech being conducted with the forum created.  This element requires far less extensive analysis than the intent prong, as a university campus is clearly "an appropriate place for communication of views on issues of political and social significance".  <u>See</u> <u>Chiu</u>, 260 F.3d at 349 (<u>quoting</u> <u>Estiverne v. Louisiana State Bar Assn.</u>, 863 F.2d 371, 378-79 (5th Cir. 1989).

The only plausible argument to the contrary is the University's contention that the Literature Policy's prohibition of anonymous leafleting functions as a mechanism for excluding non-university-affiliated leafleters, thus preserving the campus for student use.  This argument has some intuitive merit, but is properly considered <u>infra</u> as an argument that the Literature Policy serves a significant state interest, and thus <u>survives</u> strict scrutiny, rather than as an argument for <u>avoiding</u> strict scrutiny altogether.

In sum, we hold that the University, through its own policies, has designated the outdoor open areas of its campus generally accessible to students  -- such as plazas and sidewalks -- as public forums for student speech.  As such, the Literature Policy's

16

prohibition of anonymous leafleting in such areas is subject to strict scrutiny.

### III

In order to survive First Amendment strict scrutiny, a content neutral restriction on speech must be narrowly tailored to a significant state interest and must leave open ample alternative channels of communication.[14] See, e.g., Perry Education Assn., 460 U.S. at 45. The University contends that the basic function of the Literature Policy is to allow University officials to identify the source of a given piece of literature and thereby prevent non-affiliated persons or groups from distributing literature on campus. As such, the University argues, the Literature Policy serves a significant state interest by preserving the campus for speech by students, faculty, and staff.

JFA contends that the University's forum preservation rationale is largely pretextual. It argues that the Literature Policy is underinclusive for the purpose of preventing on-campus speech by non-affiliated persons. JFA observes that, although the

---

[14] JFA contends that the district court erred in classifying the Literature Policy as a content neutral restriction on speech. Instead, JFA asserts, the policy is a content-based restriction, insofar as it requires personal or group identification on the literature itself, and therefore must be (1) narrowly tailored to a "compelling government interest" and (2) the least restrictive alternative available to the government. See, e.g., United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 813 (2000). Because the Literature Policy fails to satisfy either formulation of strict scrutiny, we will assume, arguendo, that the Literature Policy is content neutral and that the less demanding test applies.

17

Regents Rules prohibit non-affiliated persons from using the University campus for speech of any type, the University's attempts to preserve the forum for students by prohibiting anonymous speech extend only to the distribution of literature.  Other forms of anonymous speech, such as signs and oratory, are permitted.

The space available for distribution of literature by students is reduced to the same extent where a non-affiliated person communicates via anonymous picketing, as opposed to anonymous leafleting.  Because the University prohibits the latter while permitting the former -- and presents no compelling argument as to why the two ought to be distinguished for purposes of "forum preservation" -- we agree that the credibility of its rationale is diminished.  See City of Ladue v. Gilleo, 512 U.S. 43, 52 (1994).[15]

Nonetheless, we are persuaded that, as a general principle, the government does have a significant interest in preserving the

---

[15] The credibility of the University's rationale is further eroded by the Literature Policy's ineffectiveness at accomplishing even the narrow objective that the University has elected to pursue -- i.e., preserving the campus forum by prohibiting anonymous leafleting by non-affiliated persons.  The University concedes that the main practical effect of the Literature Policy is to permit officials to collect anonymous leaflets "that have been detached from their speaker" and are "floating around the campus".

Removing abandoned literature after it has been distributed does little to free up space for legitimate distribution by students.  Indeed, it would appear that a more plausible explanation for the Literature Policy is the University's interest in the prevention and removal of litter -- a justification the University advanced before the district court but abandoned on appeal.

campuses of public colleges and universities for the use of students. As such, we will assume that the narrow purpose actually served by the Literature Policy -- i.e., preserving outdoor areas of the campus specifically for leafleting by students -- likewise represents a significant state interest.

In addition, it is clear that the Literature Policy leaves open "ample alternative channels of communication" for students. See Perry Education Assn., 460 U.S. at 45. As JFA acknowledges, numerous forms of anonymous speech -- including oratory, public displays, and signs -- remain available for students who wish to employ them.

The crux of our analysis is the "narrow tailoring" requirement. A regulation is narrowly tailored when it "does not burden substantially more speech than is necessary to further the government's legitimate interest". Hays County Guardian, 969 F.2d at 118 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989)). Even a legitimate interest cannot justify a restriction if the latter accomplishes its goal at "an inordinate cost to speech". Id.

The University contends that the Literature Policy is narrowly tailored because "the campus forum is defined by who can speak", and thus, a speaker's identity "is the necessary admission pass to use this forum at all". This argument misses the finer point at issue. It is undoubtedly true that the Literature Policy represents one method of identifying a given speaker. The "narrow

19

tailoring" inquiry, however, asks whether that particular method burdens substantially more speech than is necessary. In short, the relevant question today is not whether the university may require an "admission pass" to leaflet on campus, but whether that "pass" need be printed on every leaflet that a student distributes and reveal his identity to everyone.

We hold, as we must, that the Literature Policy is not narrowly tailored to the state's interest in "forum preservation". The essence of the University's "forum preservation" rationale is the need of <u>certain</u> <u>University</u> <u>officials</u> to know whether a given leafleter is or is not affiliated with the University, such that, if he is not, he (and his leaflets) can be removed. By contrast, the Literature Policy requires that the speaker identify himself, not just to certain University officials, but to <u>every</u> <u>person</u> who receives the literature being distributed. As the district court observed:

> There are far more direct means through which the University can prevent non-students from leafleting on the UT Campus, which would be far less burdensome on speech. ... In order to enforce its policy, the University could direct its staff to ask suspected non-students engaging in leafleting to show a University identification card. If the distributor of the leaflet is a non-student, then the University could ask that individual to leave campus.

Although the procedure outlined by the district court might require a student distributing leaflets to identify himself to a University

20

official, it would burden substantially less speech than the Literature Policy's requirement that <u>every</u> leaflet handed out identify the student.

We recognize that any alternative policy aimed at preserving the campus for student use will likewise involve some loss of speaker anonymity. Moreover, alternative policies may yield new administrative challenges. The University contends, for example, that requiring leafleters to show identification to University officials might (1) lead to claims of selective enforcement, and (2) increase the frequency of confrontations with University police.

We do not presume to tell the University precisely how it should go about preventing unauthorized use of its campus. In response to the concerns raised above, however, we make two general observations. First, the University is responsible for ensuring the even-handed enforcement of <u>all</u> of its regulations relating to speech. To the extent that a change in policy creates a perception of selective enforcement, transparency and open dialogue would appear to be better remedies than overbroad restrictions on expression.

Second, as to concerns regarding increased confrontation with University police, the University is perfectly capable of providing students with alternatives -- that is, with some choice as to the means of identification. In particular, we do not suggest that the method of identification prescribed by the Literature Policy would

be constitutionally impermissible if alternate, less intrusive, means were also made available to students. By the University's own admission, a majority of student organizations voluntarily identify themselves on the literature they distribute. The minority who choose not to do so might be given the choice of showing identification at the point of distribution, or alternatively, advising a single designated officer beforehand that a distribution will occur at a given time and place, thereby eliminating the need to interrupt the act of distribution itself. Regardless of the precise method or methods employed, however, the University must offer student leafleters some choice as to the means of identification that does not involve disclosing name or organizational affiliation to all who receive the message.

In sum, we reiterate that, where the government designates a forum for use by a given class of speaker, it is nearly inevitable that those who wish to make use of the forum will be required to sacrifice some measure of anonymity. The Literature Policy's requirement that speakers identify themselves to every person who receives their message, however, sacrifices far more anonymity than is necessary to effectively preserve the campus forum for its intended beneficiaries. As such, the Literature Policy is not narrowly tailored to a significant government interest, and thus, is invalid under the First Amendment. Accordingly, the judgment of the district court is affirmed in this respect.

IV

Finally, having concluded our First Amendment analysis, we turn to the remedy ordered by the district court. Although JFA asked the district court to declare the Literature Policy unconstitutional on its face, the court enjoined enforcement of the policy only as it applied to JFA.

In its brief, JFA asks this court to alter the district court's ruling on the breadth of its holding, direct the district court to declare the Literature Policy unconstitutional on its face, and order the Literature Policy permanently enjoined across the board. Because JFA did not cross-appeal from the district court's judgment, however, we lack jurisdiction to expand the scope of the remedy ordered. See Ayers v. United States, 750 F.2d 449, 457 (5th Cir. 1985); United States v. American Rwy. Express Co., 265 U.S. 425, 435 (1924) (absent cross-appeal, "appellee may not attack the decree with the view either to enlarging his own rights thereunder or of lessening the rights of his adversary").

Nonetheless, we express two basic concerns as to the district court's remedy. First, it is apparent that a facial challenge to the Literature Policy was appropriate and was made in this case.[16]

---

[16] See Board of Airport Commissioners v. Jews for Jesus, Inc., 482 U.S. 569, 574 (1987) ("an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face because it also threatens others not before the court"); see also Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton, 536 U.S. 150, 167 n.14 (2002) ("We may, therefore, consider the impact of this ordinance on the free speech rights of individuals who are deterred from speaking because the registration provision would require them to forgo their right to speak anonymously.").

Nowhere in the court's order or in the magistrate judge's rather extensive report, however, is the rationale set forth for rejecting JFA's facial challenge. Our review of the record has discerned no material differences between the Literature Policy's impact on JFA and its impact on other students or student organizations. We therefore see no clear reason why an "as applied" invalidation was ordered in this case.

Equally unclear is how the University might cease enforcement of the Literature Policy against JFA in particular without abandoning the policy altogether. How, for example, is a University official to respond if he encounters a person distributing literature that does not identify its source? It would appear that, in all such cases, the official would have to assume that the distributor is a member of JFA, acting in accordance with the district court's order. As such, it seems that an injunction barring enforcement of the Literature Policy "as applied" to JFA would operate as a <u>de</u> <u>facto</u> facial invalidation.

Given this rather strange result, we think it prudent to remand the case to the district court. The court may wish to reconsider JFA's injunction request.

V

For the reasons set forth above, we AFFIRM the holding and judgment of the district court that the Literature Policy violates the First Amendment, but REMAND to the allow the district court, at

24

its option, to alter its injunction to bar the University's Literature Policy across the board.

AFFIRMED and REMANDED.