PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

AMERICAN CIVIL LIBERTIES UNION,
Student Chapter - University of
Maryland, College Park; DANIEL M.
SINCLAIR; MICHAEL REEVES;
MATTHEW FOGG,
            *Plaintiffs-Appellants,*

            v.                                    No. 04-1890

C. D. MOTE, JR.,
            *Defendant-Appellee,*

            and

REBECCA J. SHEPPARD,
                        *Defendant.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Roger W. Titus, District Judge.
(CA-03-636-RWT)

Argued: March 16, 2005

Decided: September 12, 2005

Before WIDENER and SHEDD, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Judge Widener wrote the opinion, in
which Judge Shedd and Senior Judge Hamilton concurred.

## COUNSEL

**ARGUED:** Anthony C. Epstein, STEPTOE & JOHNSON, L.L.P., Washington, D.C., for Appellants. Mark Jason Davis, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellee. **ON BRIEF:** Michael C. Drew, STEPTOE & JOHNSON, L.L.P., Washington, D.C.; David Rocah, AMERICAN CIVIL LIBERTIES UNION OF MARYLAND, Baltimore, Maryland; Arthur B. Spitzer, AMERICAN CIVIL LIBERTIES UNION OF THE NATIONAL CAPITAL AREA, Washington, D.C., for Appellants. J. Joseph Curran, Jr., Attorney General of Maryland, Baltimore, Maryland, for Appellee.

## OPINION

WIDENER, Circuit Judge:

Plaintiffs, ACLU Student Chapter-University of Maryland, College Park, Daniel M. Sinclair, Matthew Fogg, and Michael Reeves[1]

---

[1]The district court dismissed all of the plaintiffs but Reeves. Only Reeves pursues his appeal. See Br. p.3 n.2.

The plaintiffs filed a notice of appeal; the defendant did not. Because the University did not file a notice of appeal, the plaintiffs, in their brief, take the position that the University accepted the decision of the district court, that the plaintiff Reeves had standing to pursue his case.

Reeves was an outsider working for candidate Lyndon LaRouche. He sought to distribute leaflets but was denied permission because all available spaces had been reserved. When he attempted to distribute the leaflets at a nearby location, University police issued him a citation and ordered him to leave the College Park campus or be arrested for trespassing. The district court held on those and other facts that Reeves had standing. Apparently, because the issue was standing and is jurisdictional, the University has pursued the question of Reeves' standing in its brief, although it did not appeal. We do not decide the question of Reeves' standing, however, because the question the University seeks to make is that Reeves suffered no injury in fact.

In such a case, under *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 239 (4th Cir. 1988) (citing *Bell v. Hood*, 327 U.S.

appealed from the district court's denial of their motion for summary judgment and the district court's grant of summary judgment to defendant, C.D. Mote, Jr., President of the University of Maryland, College Park. The underlying case was a challenge, on First Amendment grounds, of the University policy that restricted speech in outdoor areas of the campus. The only issue that remains is the University's policy restricting speech in outdoor areas by members of the general public. We affirm.

I.

The State of Maryland has established a system of higher education "[i]n order to foster the development of a consolidated system of public higher education, to improve the quality of education, to extend its benefits and to encourage the economical use of the State's resources." Md. Code Ann. Educ. § 12-101 (2004). College Park is considered the State's flagship campus in that endeavor. Md. Code Ann. Educ. § 12-106(a)(1)(iii)(1)(A) (2004). Its campus occupies over 1,200 acres in College Park, Maryland, enrolls 34,000 students, approximately a quarter of which live on campus, and employs approximately 12,000 faculty and staff members. Defendant C.D. Mote, Jr. is the president of the University at College Park[2] and approved and issued the regulation challenged in this case.

The policy at issue provides for access to the campus's facilities by outsiders. The policy recognizes that "[u]niversity facilities are available primarily for programs offered by and intended for the campus community." The policy goes on to authorize the use of Nyumburu Amphitheater, for public speaking, and designated sidewalks outside

678, 682 (1946)), when the contested basis for jurisdiction is also an element of a plaintiff's federal claim, we held the claim should not be dismissed for lack of jurisdiction. And when the claim is neither immaterial or insubstantial, as here, the proper course of action is for the district court to accept jurisdiction and address the objection as an attack on the merits, *Rivanna Trawlers*, 840 F.2d at 239, which we do here.

[2]The State University System in Maryland is headed by a chancellor who appoints the president of each constituent institution, of which the University of Maryland, College Park, is one. See Md. Code Ann. Educ. §§ 12-108; 12-109.

the Stamp Student Union, for distribution of literature, by "persons or groups other than students, faculty, and staff, and not otherwise sponsored by a department or registered student organization." (hereinafter outsiders) The Stamp Student Union is the single most trafficked place by a cross-section of the campus, and Nyumburu is next to it. If a member of the general public is sponsored by a member of the campus community they have the same access to facilities as their sponsor. The only requirements for an outsider to engage in public speaking or distributing literature on campus is that they reserve space at the appropriate location by registering with the campus reservations office up to five days in advance. Under the policy, reservations are to be approved on a space-available basis with priority given to University departments, registered student organizations, students, faculty, and staff. Lack of available space is the only acceptable reason to deny a permit. Unsponsored public speaking and distribution of literature by outsiders is prohibited away from Nyumburu and Stamp Student Union, respectively. Failure to follow the University regulations "will result in revocation of an approved reservation and/or other appropriate administrative action." If the violator is a member of the public, they may be required to leave the campus.

## II.

We review *de novo* a district court's grant of summary judgment. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va. Inc.*, 43 F.3d 922, 928 (4th Cir. 1995). When, as here, a party appeals the denial of summary judgment together with an appeal of the granting of a cross-motion for summary judgment, we have jurisdiction to review the propriety of the denial of summary judgment by the district court. *Monahan v. County of Chesterfield*, 95 F.3d 1263, 1265 (4th Cir. 1996)(citing *Sacred Heart Med. Ctr. v. Sullivan*, 958 F.2d 537, 543 (3d Cir. 1992)). Summary judgment under Rule 56(c) is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

## III.

The issue in this case is plaintiff's assertion that the University's policy violates the speech clause of the First Amendment. The First

Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." Under our decision in *Goulart v. Meadows*, 345 F.3d 239 (4th Cir. 2003), when a First Amendment claim is asserted the court must begin the inquiry by determining whether the plaintiff had engaged in protected speech. *Goulart*, 345 F.3d at 246 (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)). If that is the case, the court next "must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Goulart*, 345 F.3d at 246 (quoting *Cornelius*, 473 U.S. at 797). After determining the type of forum, the court must determine whether the justifications for the exclusion satisfy the requisite standard for that forum. *Goulart*, 345 F.3d at 246 (citing *Cornelius*, 473 U.S. at 797). The first step in the analysis is easily answered here. Reeves attempted to engage in speech of a political nature, which the parties agree is protected speech.

We next turn to the second question in the analysis, what is the nature of the forum. There are three different types of forums in First Amendment cases, traditional public forums, non-public forums, and limited (or designated) public forums. *Warren v. Fairfax County*, 196 F.3d 186, 190-91 (4th Cir. 1999)(citing *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998)). A traditional public forum, such as streets, sidewalks, and parks, requires the government to accommodate all speakers, because these places have the characteristics of a public thoroughfare, a purpose that is compatible with expressive conduct, as well as a tradition and history of being used for expressive conduct. *Warren*, 196 F.3d at 191. The government can restrict speech in a traditional public forum on the time, place and manner of expression only, if the restriction is content-neutral, is narrowly drawn to serve a significant state interest, and leaves open ample channels of communication of the information. *Warren*, 196 F.3d at 192; see also p.202.

Conversely, a non-public forum is one that has not traditionally been open to the public, where opening it to expressive conduct would "somehow interfere with the objective use and purpose to which the property has been dedicated." *Warren*, 196 F.3d at 192-93. Restrictions on speech in a non-public forum should be upheld if they are viewpoint neutral and reasonable "in light of the purpose of the

forum and all the surrounding circumstances." *Warren*, 196 F.3d at 193 (quoting *Cornelius*, 473 U.S. at 809).

The third type of forum, a limited or designated public forum, is one that is not traditionally public, but the government has purposefully opened to the public, or some segment of the public, for expressive activity. *Warren*, 196 F.3d at 193 (citing *Ark. Educ.*, 523 U.S. at 677). Once a limited or designated public forum is established the government can not exclude entities of a similar character to those generally allowed. *Goulart*, 345 F.3d at 250 (citing *Warren*, 196 F.3d at 194).

Plaintiff argues that the outdoor areas of the College Park campus should be considered public forums. To support this argument plaintiff points to the fact that access to the outdoor areas are not limited to students, faculty and staff, but instead are generally open to any member of the public, and that the University allows members of the public to engage in any lawful activity in these open areas except public speaking and handbilling. While this is true, it is not determinative because "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. Plaintiff's argument is also answered by looking to the Supreme Court decision in *Widmar v. Vincent*, 454 U.S. 263 (1981), which recognized that "the campus of a public university, at least for its students, possesses many of the characteristics of a public forum." 454 U.S. at 267 n.5 (citing *Police Dept. of Chicago v. Mosley*, 408 U.S. 92 (1972). The Court then went on to say that "[a] university differs in significant respects from public forums such as streets or parks or even municipal theaters." *Widmar,* 454 U.S. at 267 n.5.

Examining the circumstances of this case, we are of opinion and agree with the district court that the College Park campus is a limited public forum. Contrary to plaintiff's arguments, the campus is not akin to a public street, park, or theater, but instead is an institute of higher learning that is devoted to its mission of public education. This mission necessarily focuses on the students and other members of the university community. Accordingly, it has not traditionally been open to the public at large, but instead has been a "special type of enclave" that is devoted to higher education. *United States v. Grace*, 461 U.S.

171, 180 (1983). There is nothing in the record to indicate that until the policy at issue here was implemented, the campus was anything but a non-public forum for members of the public not associated with the university. By implementing its policy the University made the campus a limited public forum. *See Goulart*, 345 F.3d at 249 (a limited public forum can only be created by purposeful government action).

After determining that a limited public forum exists, a court must next determine whether an internal or external standard should apply. *See Warren*, 196 F.3d at 193-94. An internal standard applies and the restriction is subject to strict scrutiny "if the government excludes a speaker who falls within the class to which a designated [limited] public forum is made generally available . . ." *Warren*, 196 F.3d at 193 (quoting *Ark. Educ.*, 523 U.S. at 677). An external standard applies if the person excluded is not a member of the group that the forum was made generally available to. *Warren*, 196 F.3d at 194. Under the external standard, "the selection of a class by the government must only be viewpoint neutral and reasonable in light of the objective purposes served by the forum." *Warren*, 196 F.3d at 194. The only Constitutional limit placed on restrictions on public access in these cases is that, "once a limited forum has been created, entities of a 'similar character' to those allowed access may not be excluded." *Warren*, 196 F.3d at 194 (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 53 (1983)).

The court must next determine if those being excluded are of a similar character to those who are allowed access, that is the members of the University community who are permitted to speak freely on University grounds. Under our decision in *Goulart* whether a person is of a "similar character" to others permitted to speak in the forum depends on the purpose of the limited forum. *Goulart*, 345 F.3d at 252. The purpose of the University is clearly to provide a venue for its students to obtain an education, not to provide a venue for expression of public views that are not requested or sponsored by any member of the campus community. While it is obviously true that there could be similarities in the content of speech by an outsider and a member of the campus community, that does not require them both to be treated the same. This case is clearly an example of where "the government may draw permissible status-based distinctions among

different classes of speakers in order to preserve the purpose of the forum, even when the proposed uses by those inside the permitted class of speakers and those outside the permitted class of speakers are quite similar." *Goulart*, 345 F.3d at 254.

Having decided that the University's campus is a limited public forum, and that the external standard applies in this case, the restriction by the University only has to be "viewpoint neutral and reasonable in light of the objective purposes served by the forum." *Warren*, 196 F.3d at 194. Plaintiff argues that the University's policy lacks both viewpoint neutrality and reasonableness, thus failing this standard. To support his assertion that the policy is not viewpoint neutral plaintiff points to one occasion where the University allowed a protest staged by the Westboro Baptist Church other than within the limits of the regulations. The record shows that the University, as an academic exercise, had raised the subject of community reaction to the killing of a homosexual college student by showing a play called "The Laramie Project" to foster more discussion among students involved in the University's First Year Book Program. Knowing the Baptists were opposed, the University permitted their protest away from Nyumburu and at the play's location. We think this lessened restriction was "reasonable in light of the *purpose* served by the forum." *Goulart*, 345 F.3d at 259 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001))(emphasis in *Goulart*). As stated previously, the purpose of the University is the education of the students. Permitting this protest furthered that interest and was therefore reasonable in light of it. The University regulations contain no regulation on speech or handbilling based on content or viewpoint.

Having determined that the University's policy is viewpoint neutral, the court must then determine if the policy is "reasonable in light of the *purpose* served by the forum." *Goulart*, 345 F.3d at 259 (quoting *Good News Club*, 533 U.S. at 107)(emphasis in original). To support this argument plaintiff relies upon our decision in *Metromedia Publ'g Co. of S.C., Inc. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154 (4th Cir. 1993). *Metromedia* is not applicable here however, because that case concerned a total ban on the placement of newspaper racks, which we held to be unreasonable under the circumstances. This case does not involve a total ban of speech by the general public, it merely involves a time, place, and manner restriction. We begin this

analysis by noting that the University's policy "need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808 (emphasis in original). The University policy does not deny un-sponsored outsiders access to its campus, but instead merely requires them to reserve a spot which they may do as much as five days in advance, and then speak or distribute leaflets in that part. We especially note the places for speaking or handbilling are the most visited on the campus, a distinct advantage to the speaker or handbiller. If outsiders desire to leaflet or give a speech in another area of campus, they must simply find a sponsor, and they can perform these activities anywhere on the campus. We have previously recognized that universities have limited resources, which they have an interest in reserving for members of the university community. *Glover v. Cole*, 762 F.2d 1197, 1203 (4th Cir. 1985). If the University opened its entire campus to all members of the unaccompanied public, it would have to utilize a greater amount of those resources by, for instance, dispersing the limited staff throughout the campus to supervise the events. We are of opinion that this simple requirement of a sponsor is reasonable.

Reeves' final First Amendment argument is that the University's policy acts as an impermissible prior restraint on speech because it gives university officials unbridled discretion. *11126 Balt. Blvd., Inc. v. Prince George's County, Md.*, 58 F.3d 988, 993-94 (4th Cir. 1995). Reeves necessarily is making this argument concerning the areas away from Stamp and Nyumburu, because permits for those locations can only be denied due to lack of space, giving university officials virtually no discretion. As discussed, the University is a limited public forum, and as such can constitutionally exclude outsider speech as long as the exclusion is viewpoint neutral and reasonable. See, e.g., *Griffin v. Dep't of Veterans Affairs*, 274 F.3d 818, 825 (4th Cir. 2001). Having already determined that the University's policy is viewpoint neutral and reasonable, it is also not an impermissible prior restraint.

The judgment of the district court is accordingly

*AFFIRMED.*