In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 06-1441

JAMES G. GILLES,

*Plaintiff-Appellant*,

*v.*

BRYAN K. BLANCHARD, *et al.*,

*Defendants-Appellees*.

———————

Appeal from the United States District Court
for the Southern District of Indiana, Terre Haute Division.
No. 2:04-cv-0083—**Larry J. McKinney**, *Chief Judge*.

———————

ARGUED OCTOBER 31, 2006—DECIDED FEBRUARY 14, 2007

———————

Before POSNER, WOOD, and EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*. Vincennes University, the oldest institution of higher education in Indiana (founded in 1806 by future President William Henry Harrison before Indiana was admitted to statehood)—and a public institution since its inception—has its main, and only residential, campus in the town of Vincennes (population 18,000) in southwestern Indiana. About 5,000 students, all undergraduate, are enrolled full time at the Vincennes campus.

James Gilles ("Brother Jim") (home page http://www.thecampusministry.org/, visited Feb. 2, 2007) is a traveling

evangelist—the latest in a line of Christian itinerant preachers stretching back to Saint Paul and prominent in Methodism in nineteenth-century America. Born near Vincennes, Gilles gives the following account of his salvation. As a result of Satan's machinations, he devoted himself as a youth to drugs, sex, booze, and rock and roll. At a rock and roll concert at which the well-known Van Halen band performed, singer David Lee Roth shouted to the crowd: "Not even God can save your soul at a Van Halen concert!" Gilles saw the light, called on God to save him and thus refute Roth, and was saved. The message he preaches, as summarized in his own words, is "Sinner friend, I have good news for you, you also can experience righteousness, peace and joy in the Holy Ghost if you would only forsake your sinful, selfish ways and turn to the The Lord And Savior Jesus Christ." Neither the record nor Brother Jim's home page indicates that he is affiliated with any religious organization, although in another case in which he was turned away by a university he is identified as a member of the Free Pentecostal Holiness Churches, *Gilles v. Torgersen*, 71 F.3d 497, 499 (4th Cir. 1995) (dismissed without a decision on the merits), presumably a reference to the Pentecostal Holiness Church, a Protestant denomination with Methodist antecedents. None of this, of course, is important. There is no reason to doubt either his bona fides or that the content of his religious advocacy is protected by the First Amendment. The question is whether the protection extends to a particular site on the university campus.

Vincennes University and Brother Jim first intersected in 2001, when he entered the campus uninvited and walked to a lawn in the middle of the campus, next to the university library. He preached from the lawn and a

disturbance ensued, the nature of which is not revealed by the record, although the university's dean of students stated in his deposition that "when I went there, he [Brother Jim] was in the grassy area in front of the library. He had had—he was speaking to a number of students there. There was some—a disturbance, and at one point the campus police felt like he was in danger. And they asked him to leave, and he did." From another case we learn that "when preaching, [Brother Jim] uses a confrontational style that includes calling people in the crowd names, such as whoremonger and drunkard, once the individuals have answered certain questions that he poses to them. He has been arrested on numerous occasions in the past." *Gilles v. Torgersen*, No. 92-0933, 1995 U.S. Dist. LEXIS 8502, at *2 (W.D. Va. Jan. 31, 1995), vacated for want of standing, 71 F.3d 497 (4th Cir. 1995). Brother Jim denied that his preaching at Vincennes in 2001 had caused a disturbance, and in the procedural posture of the case we must credit his denial.

In reaction to the incident—whatever exactly it was—the university for the first time adopted a formal policy governing access to the campus by outsiders to the university community. Entitled "Sales and/or Solicitation Policy," the policy requires prior approval by the dean of students of all sales on campus. In addition, and more to the point of this case, the policy also requires the dean's prior approval of all "solicitations" on campus. Solicitation is defined as "the act of seeking to obtain by persuasion; to entice a person to action; or the recruiting of possible sales." Solicitors, if approved, are limited to soliciting in the brick walkway directly in front of the student union.

Here is a satellite photo of the campus, showing the library lawn and the walkway.



Brother Jim returned to the campus the following year, proceeded to the lawn, was turned back and told he could preach only on the brick walkway. He tried to preach there, but the fact that the walkway is adjacent to a street makes it a noisy locale for a speech. Unable to attract an audience, he broke off and left, and filed this suit against the responsible university officials, contending that the solicitation policy infringes his right of free speech. The district court granted summary judgment for the defendants.

Brother Jim argues that since the lawn is public property and is suitable for speechifying, he can no more be forbidden to preach there than he could be forbidden to preach in a public park. That is incorrect. The Justice Department in Washington has a large auditorium, with a stage, and so would be a suitable venue for a theatrical production. But the First Amendment does not require the department to make the auditorium available for that purpose even when it is not being used for departmental business. Public property is property, and the law of trespass protects public property, as it protects private property, from uninvited guests. "[T]he Government, 'no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated,' *Greer v. Spock,* 424 U.S. 828, 836 (1976)." *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 800 (1985). Since public and private universities compete with each other, courts hesitate to impose in the name of the Constitution extravagant burdens on public universities that private universities do not bear. Cf. *Chicago Acorn v. Metropolitan Pier & Exposition Authority*, 150 F.3d 695, 704 (7th Cir. 1998).

It is not as if requiring a public university to throw open its grounds to itinerant speakers would merely redress the advantage that a public university has over a private one because it has taxpayer support; the requirement would deny the university control over its facilities. The courts reject the proposition "that a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings." *Widmar v. Vincent*, 454 U.S. 263, 268 n. 5 (1981). "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. Florida*, 385 U.S. 39, 47 (1966); see also *United States Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 129 (1981).

No matter how wonderfully suited the library lawn is to religious and other advocacy, Vincennes University could if it wanted bar access to the lawn to any outsider who wanted to use it for any purpose, just as it could bar outsiders from its classrooms, libraries, dining halls, and dormitories. It wouldn't have to prove that allowing them in would disrupt its educational mission. See *American Civil Liberties Union v. Mote*, 423 F.3d 438, 444 (4th Cir. 2005). "[G]overnment may draw permissible status-based distinctions among different classes of speakers in order to preserve the purpose of the forum, even when the proposed uses by those inside the permitted class of speakers and those outside the permitted class of speakers are quite similar." *Goulart v. Meadows*, 345 F.3d 239, 254 (4th Cir. 2003).

What is true is that a university that decided to permit its open spaces to be used by some outsiders could not exclude others just because it disapproved of their mes-

sage. E.g., *Rosenberger v. Rector & Visitors of University of Virginia,* 515 U.S. 819, 828-30 (1995). But it could use neutral criteria for access, such as that an outsider must be invited to speak on campus by a faculty member or a student group. *American Civil Liberties Union v. Mote, supra,* 423 F.3d at 444. The difference between invited and uninvited visitors is fundamental to a system of property rights. "The fact that other civilian speakers and entertainers had sometimes been invited to appear at Fort Dix did not of itself serve to convert Fort Dix into a public forum or to confer upon political candidates a First or Fifth Amendment right to conduct their campaigns there. The decision of the military authorities that a civilian lecture on drug abuse, a religious service by a visiting preacher at the base chapel, or a rock musical concert would be supportive of the military mission of Fort Dix surely did not leave the authorities powerless thereafter to prevent any civilian from entering Fort Dix to speak on any subject whatever." *Greer v. Spock*, 424 U.S. 828, 838 n. 10 (1976). Coming closer to this case, we said in *Piarowski v. Illinois Community College District 515,* 759 F.2d 625, 629 (7th Cir. 1985), that the fact "that Piarowski sometimes invited artists from outside the college to exhibit their work in the [college's art] gallery no more made the gallery a public forum than a teacher's inviting a guest lecturer to his classroom would make the classroom a public forum."

Brother Jim places great weight on *Bowman v. White*, 444 F.3d 967 (8th Cir. 2006), which held that a public university that allowed anyone to use its outdoor spaces for public speaking could not limit that use by outsiders to five days (per outsider) per semester. The limit did not discriminate against particular viewpoints. It merely gave preference to insiders, which strikes us as

eminently reasonable and leads us to doubt the sound-
ness of the decision, for in *Cornelius v. NAACP Legal
Defense & Educational Fund, Inc.*, *supra*, 473 U.S. at 806, the
Supreme Court said that "control over access to a
nonpublic forum can be based on subject matter and
speaker identity so long as the distinctions drawn are
reasonable in light of the purpose served by the forum and
are viewpoint neutral"; cf. *United States v. Kokinda*, 497
U.S. 720, 730 (1990) (plurality opinion). Our case is in any
event distinguishable from *Bowman* because Vincennes
University has placed the lawn completely off limits to
uninvited outsiders, and if it can't do that without violat-
ing the Constitution, public universities cannot control
their property. Confining solicitations to the walkway in
front of the student union is entirely appropriate because
most of the solicitations are of students, and where better
to encounter a steady stream of them than outside the stu-
dent union? Letting solicitors into the middle of the
campus would disrupt the campus atmosphere.

But here is the rub. In responding to Brother Jim's lawn
preaching in 2001 by promulgating a policy limited to
sales and solicitations, the university could be thought to
have thrown open the lawn to all outsiders who were
*not* selling or soliciting. Brother Jim argues forcefully that
he does neither, and he asks us to infer (or allow a jury
to infer) that the application of the policy to him was
therefore pretextual and discriminatory. Not that the
university necessarily disapproves of his message. It may
just fear a disturbance. But yielding to a "heckler's veto"
infringes a speaker's free speech. *Church of American
Knights of Ku Klux Klan v. City of Gary*, 334 F.3d 676, 680-81
(7th Cir. 2003), and cases cited there.

Brother Jim certainly is not selling anything. And he does not solicit or receive contributions or seek to "entice" members of his audiences to "action." He tries merely to save their souls and make them happy. Of course, as he explains, salvation requires them to give up, as he gave up, drugs, sex (Brother Jim means fornication and adultery—he is not a Shaker), booze, and rock and roll. But that is enticement to inaction rather than to action. It is remote from what is ordinarily understood by "solicitation." To solicit, in law as in ordinary language, is to ask someone to do something, usually of a commercial or quasi-commercial character, for the solicitor—so one solicits a prostitute for sex (or the prostitute solicits one), or solicits donations to a charity, or solicits a competitor to join in a price-fixing conspiracy. A priest who urged conversion to the Catholic Church might be thought to be engaged in solicitation, and likewise Jehovah's Witnesses when they go door to door seeking converts. But the Pope is not soliciting when he gives a speech from the balcony of St. Peter's, even though it is implicit or explicit in his message that the listeners should conform their behavior to the teachings of the Church. That is the character of Brother Jim's preaching. If the Pope and Brother Jim are solicitors, almost anyone who opens his mouth to say anything is a solicitor.

The application of the university's solicitation policy to Brother Jim brings him to the verge of victory. The policy as interpreted by the defendants to cover preaching the Gospel is hopelessly vague and thus a supple weapon for excluding from the university lawn those outsiders whose message the university disapproves of. But Brother Jim falls just short of prevailing because he has failed to show that *any* uninvited outsider has ever

been permitted to use the lawn for any purpose. No doubt outsiders wander in from time to time. The campus is not fenced, and outsiders are not forbidden to visit. They are classic licensees. But we are given no instance of an outsider's being permitted to do more than stroll on the lawn—no instance of an outsider's being permitted to give a speech, to play the bongo drums, to pitch a tent, to beg, to sunbathe, to play frisbee, or to engage in solicitation—without an invitation, whether from the university or from a faculty member or a student group.

This has long been a norm, and not just a practice: strangers to the university community are not to use the library lawn for purposes other than those unobtrusive, implicitly authorized uses of land (generally as a shortcut or other pathway) that distinguish a licensee from a trespasser. E.g., *Sammons v. American Automobile Association*, 912 P.2d 1103, 1105 (Wyo. 1996); *Lakeview Associates, Ltd. v. Maes*, 907 P.2d 580, 581-82 (Colo. 1995). So unlikely is it that a university or any other landowner would, as Brother Jim contends Vincennes University does, give strangers a right to roam the campus speechifying, begging, buttonholing, skateboarding, drag racing, etc., that he had to produce *some* evidence of that unlikely authorization in order to create a genuine issue of material fact—some evidence that would allow a reasonable jury to find that the university has such a permissive policy and merely denies Brother Jim the benefit of it lest his incendiary preaching ignite another disturbance.

Brother Jim does point to numerous expressive activities that have taken place on the library lawn, including religious activities—preaching by a couple named Duncan and the annual distribution of free Bibles by the Gideon Society. But of all the expressive activities that have

taken place on the lawn, the record discloses only one that was not by invitation. The Duncans had not been invited. They had preached on the lawn in 1998, three years before Brother Jim's first visit, and the circumstances of their visit are hazy. One unauthorized use of the lawn would not come close to establishing the absence of a policy against use of the lawn by uninvited speakers. Maybe no one complained, and as a result the violation did not come to the attention of the university authorities—indeed, the dean of students attested that he had never learned of the matter. Perfect past compliance with a rule is not a precondition to being allowed to continue enforcing the rule. Otherwise few rules could be enforced, and universities would have to fence their open areas in order to limit access.

Brother Jim lists the following speakers or events that have taken place on the library lawn, in addition to the Duncans' preaching and the Gideons' handing out Bibles: Women of Essence; Black Male Initiative; Indiana National Guard; Kernan and Davis for Indiana campaign; Rebekka Armstrong (an HIV-positive former Playboy Playmate); Mark Sterner (speaker on drunk driving); Mentalist Craig Karges; TB Re-Screening; Student Part Time Job Fair; The Man Without a Face (an oral cancer survivor who lost half his jaw and part of his tongue); Health Screening; Ariana Huffington; Dr. Peter DeBenedittis (speaker on how the media manipulate consumers); Manufacturing Job Fair; Amanda Persinger (pharmaceutical representative); Prentis Hall Sales Representative; Tupperware Multihost Bingo/Party; Kevin Riggins (speaker against athletic doping); Kelly Craig (speaker against drunk driving); and the Red Cross Blood Drive. This bewildering miscellany refutes an inference of dis-

crimination against disfavored points of view, or of a university administration fearful of controversy and of the disturbances that might ensue. As far as appears, any student group can invite any speaker to speak on the library lawn. The diversity of speakers mirrors the diversity of the university community.

Of course there would be even greater diversity of viewpoints if *anyone*, invited or uninvited, could use the lawn for expressive activity; for apparently no one in the Vincennes University community wants to invite Brother Jim to speak. He wants to turn the lawn into an American version of Speakers' Corner in London's Hyde Park, where anyone can speak on any subject other than the Royal family or the overthrow of the British government. The limits that Vincennes University has placed on the use of the library lawn are consistent with limiting university facilities to activities that further the interests of the university community. The limits are constitutional.

We should note that the defendants wanted us to pitch our analysis on the distinction that the Supreme Court has drawn between "traditional public forums," "designated public forums," and "nonpublic forums." E.g., *Good News Club v. Milford Central School*, 533 U.S. 98, 106-07 (2001); *International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678-79 (1992). The first consist of streets and parks and other public property that are traditional, and, the Supreme Court has ruled, irrevocable venues for expressive activity (marches, demonstrations, harangues, and so forth). The second consist of public facilities for expression that are nontraditional, such as public theaters, and used for only some types of expressive activity even though they could be used for others as well—a public theater could be used for political rallies. The Court

does not require that they be used for expressive activities for which they were not intended to be used, provided that there is no discrimination based on the message of the excluded speaker, or that their use for expressive activity be irrevocable. The third category consists of public facilities like the Justice Department's auditorium that could be used for private expressive activities but are not—and they do not have to be.

The difficulty with using the "forum" template to resolve this case—a difficulty that is common enough where rules are concerned—is that the present case falls into a crack between the rules. The library lawn is not open to all outsiders, or closed to all outsiders, or reserved for some uses but not others. To fill the crack, cases such as *Bowman v. White*, *supra*, 444 F.3d at 975-76; *Justice for All v. Faulkner*, 410 F.3d 760, 765-69 (5th Cir. 2005), and *Travis v. Owego-Apalachin School District,* 927 F.2d 688, 692 (2d Cir. 1991), have carved out a fourth category—a variant of the second, the "designated public forum." This fourth category is variously (and confusingly) termed the "limited designated public forum" (versus the "true forum"), the "limited public forum," or the "limited forum." The terms denote a public facility reserved for some speakers but not others, here members of the university community and their guests but not uninvited outsiders.

We doubt the utility of multiplying categories in this fashion, thus adding epicycles to an already complex scheme and turning the search for sensible results into a classification game. The issue more simply posed is whether a university should be able to bar uninvited speakers under a policy that by decentralizing the invitation process assures nondiscrimination, and a reasonable diversity of viewpoints consistent with the univer-

sity's autonomy and right of self-governance. We have tried to explain why the Constitution does not commit a university that allows a faculty member or student group to invite a professor of theology to give a talk on campus also to invite Brother Jim and anyone else who would like to use, however worthily, the university's facilities as his soapbox. To call the library lawn therefore a "limited designated public forum" is an unnecessary flourish.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*