**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0347n.06
Filed: June 18, 2008

**No. 07-3645**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JAMES G. GILLES, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| v. | ) | SOUTHERN DISTRICT OF |
| | ) | OHIO |
| JIM GARLAND, | ) | |
| | ) | |
| Defendant, | ) | O P I N I O N |
| | ) | |
| and | ) | |
| | ) | |
| ANDREW POWERS, individually and in | ) | |
| his official capacity (Patrol Commander, | ) | |
| Miami University Police Department); | ) | |
| DAVID HODGE, in his official capacity | ) | |
| (President of Miami University), | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE:    SILER, MOORE and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.** Plaintiff-appellant James G. Gilles, a campus evangelist, was

denied permission to continue a speech on the grounds of Miami University in Oxford, Ohio. He

sued campus officials, alleging the policy they enforced is violative of his free speech, free exercise,

due process and equal protection rights. The district court dismissed the complaint for failure to state

a valid claim, holding that the challenged policy represents a reasonable, content-neutral restriction. Plaintiff's challenge to this ruling on appeal is limited to the free speech and due process claims.

Our review of the facial validity of plaintiff's claims is handicapped by the fact that the parties made little effort to communicate with each other before this litigation was commenced. Years later, this pattern is repeated in the appellate briefing, as the parties continue to argue past each other. Yet, viewing the allegations of the complaint liberally in plaintiff's favor, we conclude that dismissal of these two claims at the pleading stage was premature. For the reasons that follow, we therefore reverse the district court's dismissal of plaintiff's free speech and due process claims.

## I. BACKGROUND[1]

James Gilles is a Christian evangelist who considers it his duty to proclaim his faith to students at colleges and universities throughout the United States and beyond. On October 14, 2002, he had been engaged in fulfilling this duty for about 45 minutes at the "Academic Quad" on the campus of Miami University in Oxford, Ohio when he was interrupted by a campus security officer, Donald Delph. Officer Delph advised plaintiff that he needed permission to conduct a speech on campus; otherwise he would be arrested. Plaintiff went to the student union to obtain a copy of the university policy. What he received stated, in pertinent part: "Every person with legitimate business at the University has the privilege of free access to the public areas of the buildings and grounds during those hours when they are open, such hours to be determined by the President or designated

---

[1]As this appeal entails *de novo* review of the lower court's Rule 12(b)(6) dismissal based on the pleadings, this fact summary is based substantially on plaintiff's version of the facts, as set forth in his complaint, which facts are accepted as true for present purposes.

University official." Complaint ¶ 23, JA 10. Plaintiff proceeded to the campus security office to inquire whether there was any area on campus where he could engage in his expressive activities. Lieutenant Andrew Powers advised him that although some areas on campus were designated as free speech areas and some were not, plaintiff's speech was not considered "legitimate business" and would not be permitted anywhere on campus.

Plaintiff thereupon retained counsel, who wrote a letter to the university's general counsel, dated November 19, 2002. The letter contended that public grounds on public university campus property represent a "traditional public forum" and that any limitation of expressive activities in these areas is unconstitutional unless "severely restricted." Asserting that religious discussion is protected speech under the First Amendment, the letter demanded rescission of the university policy that classified Gilles's religious speech as not being "legitimate business."

This letter elicited a clarifying response from university general counsel, Robin Parker, on November 27, 2002. Specifically, she denied that campus property represents a public forum. She advised that Gilles, as a visitor, was not denied access to campus property, but is certainly allowed to walk through campus. She explained that Gilles would also be allowed to conduct a formal speech if he were invited to speak by the university or any recognized student organization. Parker further explained that this "policy and consistent practice," requiring student group sponsorship of speeches by visitors, has been accepted and followed by other religious speakers, like "The Gideons," who distribute Bibles, and noted local evangelist "Brother Jeb." She invited Gilles to obtain a list of student organizations, from which he might identify a sponsor.

Gilles wrote to fifteen student organizations, but was unable to obtain sponsorship. Absent sponsorship, his desire to present a speech on campus failed to qualify for permission. Nearly two years later, Gilles commenced this action by filing a complaint in the Southern District of Ohio on October 14, 2004. Named as defendants are Jim Garland, then-President of Miami University, who has since been replaced by defendant David Hodge; and Lieutenant Andrew Powers, Patrol Commander, Miami University Police Department. In four paragraphs, the complaint asserts four civil rights claims under 42 U.S.C. § 1983, alleging defendants' promulgation and enforcement of the university's "legitimate business" policy unconstitutionally restricts plaintiff's speech. Plaintiff alleges the policy is unconstitutionally vague, overbroad and discriminatory on its face, and as applied, in violation of his freedom of speech, his right to freely exercise his religion, and his due process and equal protection rights. The complaint prays for declaratory, injunctive and compensatory relief.

Defendants moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure on December 6, 2004. Before the motion was decided, plaintiff moved for a preliminary injunction on April 1, 2005. On April 20, 2005, the district court issued a calendar order directing that the preliminary injunction motion be held in abeyance pending a ruling on the motion to dismiss. Little progress was made during the next two years. On April 20, 2007, the district court issued its opinion and order granting defendants' motion to dismiss all four claims. On appeal, plaintiff challenges only the dismissal of his free speech and due process claims. He also asks the court to order issuance of preliminary injunctive relief on remand, pending further proceedings in the district court.

## II.  ANALYSIS

### A.  Standard of Review

Whether the district court properly dismissed the complaint pursuant to Rule 12(b)(6) is a question of law subject to *de novo* review.  *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005)**.**  The reviewing court must construe the complaint in a light most favorable to plaintiff, accept all well-pled factual allegations as true, and determine whether plaintiff undoubtedly can prove no set of facts in support of those allegations that would entitle him to relief. *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005).  Yet, to survive a motion to dismiss, the complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory.  *Mezibov*, 411 F.3d at 716.  Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice.  *Id*.  Even under Rule 12(b)(6), a complaint containing a statement of facts that merely creates a *suspicion* of a legally cognizable right of action is insufficient.  *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007).  The "[f]actual allegations must be enough to raise a right to relief above the speculative level;" they must "state a claim to relief that is plausible on its face." *Id*. at 1965, 1974; *see also Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007).

### B.  Nature of Dispute

In making its ruling, the district court struggled to reconcile the claims asserted with the facts alleged in support of those claims.  Plaintiff contends the allegations of his complaint must be read

in the broadest possible manner. He characterizes his action as challenging a vague and standardless "legitimate business" policy that is enforced to ban religious expression anywhere on campus. This characterization is based on statements made to Gilles by Officer Delph and Lt. Powers on October 14, 2002. But the conversation between Gilles and Miami University did not end on October 14. A month later, Gilles sought and obtained clarification of the university's position by writing a letter to the university's general counsel. In the response Gilles received, he learned that his proposed religious expression would be permitted if and when he obtained an invitation or sponsorship from a recognized student organization. It thus became apparent that the rationale for the exclusion of Gilles's speech was not simply the unfettered discretionary determination by Lt. Powers that Gilles's preaching was not legitimate business. Rather, the proposed speech by Gilles, a visitor, was not considered legitimate business because he had not sought and secured the requisite invitation from the university administration or a student group.

The district court therefore construed plaintiff's complaint as challenging the policy whereby university authority to restrict speech on campus is delegated to student organizations. That is, notwithstanding plaintiff's argument that his claims are addressed to defendants' actions in enforcing the university's "access policy," containing the "legitimate business" criterion, the district court construed defendants' complained-of actions in light of Robin Parker's letter explaining the university's "speech policy," which made it clear that the apparent enforcement of the legitimate business requirement hinged on university or student group invitation. This was error, plaintiff contends, because all four of his claims are expressly directed to the legitimate-business access policy, not the speech policy. Plaintiff contends the district court failed to accept his allegations as

true and failed to grant him the benefit of all reasonable inferences that might be drawn from the allegations.

Yet, plaintiff's complaint includes allegations concerning Parker's letter as well. The letter is not only referred to in the complaint, but is central to an understanding of the factual bases for plaintiff's claims. It follows that the letter, attached to defendants' motion to dismiss, was and is properly considered part of the pleadings even though it was not attached to the complaint. *See Greenberg v. Life Ins. Co. of America*, 177 F.3d 507, 514 (6th Cir. 1999); *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997).

Assessing defendants' alleged actions in light of the Parker letter, the district court focused on the so-called speech policy. The district court observed that, viewed in light of plaintiff's own fact allegations, the access policy, standing alone, is only nominally implicated by plaintiff's claims. Opinion and order p. 13, n.6, JA 116.[2] Plaintiff has not alleged that he was denied access to the

---

[2]Footnote 6 provides in its entirety:

Currently, Plaintiff maintains his challenge is to Defendant's access policy, not the speech policy. However, a thorough reading of Plaintiff's Complaint reveals the speech policy, not the access policy, was the basis upon which Plaintiff's expression was stopped:

20. Officer Delph declared bluntly, "Alright you guys, you've got to get out of here. Got to go."

21. Officer Delph elaborated that [Plaintiff] *would need permission to speak on campus*. *Without a permit*, Officer Delph advised that [Plaintiff] and his colleague would be arrested.

\* \* \*

public areas of campus property, but that he was denied permission to conduct a speech. Whereas Officer Delph and Lt. Powers advised Gilles only that he could not conduct a speech because he did not have permission, Parker explained that permission to conduct a speech was conditioned upon university or student group invitation.

Plaintiff's notion that the access policy played a role in the restriction of his speech stems ostensibly from the fact that he was given a copy of that policy when he went to the student union after having been interrupted by Delph. Then, when he asked Lt. Powers for clarification, he was told only that he lacked permission to conduct a speech anywhere on campus property. Judging from the allegations, it appears that Gilles did not ask how to obtain permission and Lt. Powers did not tell him.[3] Apparently, it was only when he received Parker's letter that Gilles learned what he, as a visitor, must do to obtain permission. Gilles attempted to obtain permission by soliciting student group sponsorship. Gilles thus implicitly acknowledged that permission to conduct a speech on

---

28. [Defendant] Powers made plain to [Plaintiff] that he could not engage in any form of *expression* on the campus of MU. If he attempted to do so, he would be arrested.

(Plaintiff's Complaint, emphasis added). Nowhere in the Complaint does Plaintiff allege facts he was told to remove himself, or threatened to be removed, from MU's campus as he did not have "legitimate business". Instead, the facts as alleged in the Complaint, demonstrate he was told to stop his speaking as he had not complied with MU's speech policy. Accordingly, the Court will discuss whether, based on the facts alleged, the speech policy, which is discussed in the Complaint, imposes an impermissible restriction on speech.

[3]Plaintiff has not alleged that he ever asked any university official what constitutes "legitimate business" or how to obtain permission to conduct a speech. Even the confrontational letter sent by Gilles's attorney to university general counsel (which elicited the eventual explanation) does not include inquiry as to how Gilles might obtain permission.

campus was dependent on obtaining sponsorship, not on persuading the president or other university

official that his proposed religious speech constituted "legitimate business."

Unfortunately for him, Gilles was unable to obtain sponsorship. Gilles appears then to have

abandoned his efforts to conduct an evangelistic speech at Miami University. Two years later,

apparently without any intervening communications with university officials, he commenced this

action. The complaint is directed primarily at the access policy—despite Parker's clarifying letter,

and despite Gilles's acknowledgment, implicit in his own allegations, that permission to conduct a

speech depended not on satisfaction of the access policy legitimate-business requirement, but on

satisfaction of the speech policy student-sponsorship requirement.

We find no fault in the district court's decision to construe the complaint as actually

challenging the speech policy, which appears, by plaintiff's own allegations, to have been the actual

basis for defendants' denial of permission to conduct a speech on campus property. Considering that

the wrong complained of is denial of speech, not denial of access, it is practically inconceivable that

plaintiff could prove any set of facts consistent with his allegations that would entitle him to relief

if his complaint were construed as challenging the access policy. Until Gilles received Parker's

clarifying letter, he may have had suspicions that he had a legally cognizable cause of action based

on the university's presumed enforcement of the access policy. Parker's letter, however, dispelled

these suspicions and revealed that permission to conduct a speech was denied pursuant to the speech

policy only until he obtained sponsorship. Inasmuch as the complaint expressly acknowledges the

role of the letter in Gilles's dispute with the university, any right to relief based on the alleged

enforcement of the access policy is exposed as unsubstantiated and speculative at best—i.e.,

manifestly subject to dismissal under Rule 12(b)(6). *Twombly*, 127 S.Ct. at 1965. Only if the complaint is construed as implicitly challenging the sponsorship requirement (the acknowledged basis for the restriction of speech) does it appear to set forth a colorable claim—i.e., one that rises "above the speculative level," one that is "plausible on its face." *Id*. at 1965, 1974.

## C. Due Process

The district court recognized that plaintiff's due process challenge to the speech policy is two-pronged, based on vagueness and overbreadth theories, and rejected both. On appeal, plaintiff objects only to the district court's vagueness ruling.

The district court's evaluation of the due process vagueness challenge is embodied in two paragraphs:

> Due process requires a state enactment to be held void for vagueness if its prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The absence of clear standards guiding the discretion of the public official vested with the authority to enforce the enactment invites abuse by enabling the official to administer the policy on the basis of impermissible factors. *See Leonardson v. City of East Lansing*, 896 F.2d 190, 198 (6th Cir. 1990). The vagueness "doctrine requires that the limits the [government] claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988). Thus, a statute or ordinance offends the First Amendment when it grants a public official unbridled discretion" such that the official's decision to limit speech is not constrained by objective criteria, but may rest on "ambiguous and subjective reasons." *Desert Outdoor Advertising, Inc. v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir.1996), *cert. denied*, 118 S.Ct. 294 (1997).

> MU's speech policy is not vague. The prohibitive terms are clearly defined so as a person of ordinary intelligence could readily define the standard for inclusion and exclusion. All public speeches by a visitor to MU's campus are prohibited unless invited by MU or a student organization. Additionally, there is nothing in the

policy which permits MU officials to limit speech based on ambiguous and or subjective reasons. Nor is there any allegation that MU officials restrict the student organizations based upon content of prospective speech. In the absence of any allegations to the contrary, the court cannot conclude the policy confers "unbridled discretion" on public officials.

Opinion and order pp. 15-16, JA 118-19.

Plaintiff does not quarrel with the standards employed by the district court, but insists the court misapplied them. He complains that the policy's standards guiding officials' discretion can hardly be found to be sufficiently clear where the policy has not even been reduced to writing.[4] Indeed, the existence of the "speech policy" did not even emerge until over a month after Gilles was denied permission to speak on campus, in Parker's November 27, 2002 letter response to Gilles's attorney. In fact, despite the fact that Gilles sought clarification on October 14 from Officer Delph, from the university administration at the student union, and from Lt. Powers, he was never advised that the reason he lacked permission was that he had failed to obtain an invitation from a student group. These undisputed facts alone support a reasonable inference that the speech policy was not as clear and well-established as defendants now contend.

Even in the Parker letter, which affords the only inkling of the policy's parameters, the "policy and consistent practice" is described simply as not allowing visitors to "make formal speeches and presentations, erect displays, or conduct similar activities unless invited to do so by the University or by a recognized student organization." That's it. Defendants would have us *assume* that Parker's characterization of the unwritten policy is accurate and complete; that this unwritten

---

[4]Although there is little record on which to evaluate the policy, defendants do not dispute the charge that the policy is unwritten.

policy has been consistently and uniformly applied; and that this evidence of the unwritten policy

is conclusively sufficient to pass constitutional muster and summarily foreclose further proceedings

on plaintiff's vagueness challenge—even though the policy, as described, hardly seems believable.[5]

A policy need not be reduced to writing to survive vagueness challenge. However, if

"legitimate business," as used in the written access policy, is defined by "consistent practice" to

mean that visitors are denied access to give a formal speech unless invited by a student organization,

then the limiting practice must be "well-understood and uniformly applied." *Child Evangelism*

*Fellowship of S.C. v. Anderson School Dist. Five*, 470 F.3d 1062, 1070 (4th Cir. 2006) (quoting *City*

*of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 n. 11 (1988)). The present pleadings

afford no basis for concluding that the student-sponsorship requirement is well-understood. To the

extent the pleadings afford any insight into the operation of the unwritten policy, we can conclude

only that it was *not* well understood by university officials charged with most immediate

responsibility for enforcing it. The allegations of the complaint are devoid of any suggestion that

Officer Delph or Lt. Powers even asked Gilles if he had been invited to speak by any student

organization. Further, the complaint also affords absolutely no basis for determining that the

"consistent practice" has been and is uniformly applied.

---

[5]Can it really be that the university has abdicated all responsibility for approving or disapproving on-campus speeches and presentations by visitors? As long as a student group invites a speaker, any speaker, to speak on any subject, in any manner, at any time, in any open area, the speaker has the university's permission? The university has delegated its entire responsibility to protect the pristine campus environment from unwanted disruption . . . to student organizations—*carte blanche*? The policy defendants would have us sustain, to the extent it has been defined at all, is not only unsubstantiated, but seems implausible.

In *Gilles v. Blanchard*, 477 F.3d 466, 472-73 (7th Cir. 2007), the Seventh Circuit, evaluating a similar student-sponsorship policy challenged by the same James Gilles, characterized the policy as "hopelessly vague." Still, based on review of record evidence of the policy's operation, the court concluded that Vincenne University's construction of the policy was well-established and fairly applied. The court concluded that the challenged construction was not just a "practice," but had "long been a norm." *Id*. at 472. The "bewildering miscellany" of speakers invited to the library lawn was deemed to refute "any inference of discrimination against disfavored points of view." *Id*. at 473. Concluding that any student group could invite any speaker to speak on the library lawn, the court observed that "the diversity of speakers mirrors the diversity of the university community," demonstrating uniform non-discriminatory application of the policy. *Id*. at 474.

Here, in contrast, there is no record to evaluate. In upholding the speech policy over plaintiff's vagueness challenge, the district court concluded there is nothing ambiguous about the requirement that any visitor who would conduct a speech first obtain invitation from the university or a student organization. Yet, though the policy is nominally unambiguous in requiring a visitor to obtain an invitation, it includes no standards by which student groups are to judge requests in discharging the authority delegated them by the university. The district court observed that "there is nothing in the policy which permits MU officials to limit speech based on ambiguous or subjective reasons." Yet, as far as can be determined from the existing record, neither is there anything in the policy that guides discretion and restrains abuse. As the district court recognized in its recitation of the governing standards, it is the *absence* of clear standards guiding the discretion of the public

official that invites abuse and offends due process. Yet, the district court failed to identify any discretion-guiding standards in the speech policy.

This unwritten "policy," to the extent it has been defined in the existing pleadings at all, appears to be devoid of standards and is facially vulnerable to due process challenge. Viewing the due process vagueness claim in a light most favorable to plaintiff, it cannot be said that he undoubtedly can prove no set of facts in support of it that would entitle him to relief. The factual allegations, though sparse, are sufficient to raise a right to relief above the speculative level and present a claim that is plausible on its face. We therefore reverse the order dismissing plaintiff's due process claim.

### D. Freedom of Speech

In evaluating plaintiff's claim that his right to freedom of speech was improperly infringed, the district court began by identifying the nature of the forum in which plaintiff's right was restricted—whether traditional public forum, limited (or "designated") public forum, or nonpublic forum. The court determined that Miami University campus property represents a limited public forum. The court went on to observe that, in a limited public forum, restriction of speech is permissible if it is content-neutral and reasonable in light of the purpose served by the forum. The court held that the university's speech policy student-sponsorship requirement is content-neutral and reasonable. Accordingly, the court concluded that plaintiff's claim that the policy constituted an impermissible infringement of his free speech rights fails to state a valid claim. On appeal, plaintiff contends the district court erred in every one of these conclusions.

### 1. *Nature of Forum*

There is "no doubt that the First Amendment rights of speech and association extend to the campuses of state universities." *Kincaid v. Gibson*, 236 F.3d 342, 347 (6th Cir. 2001) (en banc) (quoting *Widmar v. Vincent*, 454 U.S. 263, 268-69 (1981)). Miami University is a state university. Scrutiny of a regulation of expressive activity in such an educational setting begins with "forum analysis." *Kincaid*, 236 F.3d at 347-48. The appropriate standard of scrutiny is determined by the nature of the forum. There are three recognized types of forum:

> The first type is a traditional public forum. A traditional public forum is a place "which by long tradition or by government fiat ha[s] been devoted to assembly and debate," such as a street or park. . . . In traditional public fora, "the rights of the state to limit expressive activity are sharply circumscribed": the government may enforce content-based restrictions only if they are narrowly drawn to serve a compelling interest, and may enforce content-neutral time, place, and manner regulations only if they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. . . . The second type of forum has been alternatively described as a "limited public forum," . . . and as a "designated public forum." . . . The government may open a limited public forum "for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." . . . Although the government need not retain the open nature of a limited public forum, "as long as it does so it is bound by the same standards as apply in a traditional public forum." . . . The third and final type of forum is a nonpublic forum. The government may control access to a nonpublic forum "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."

*Id*. at 348 (citations omitted).

Applying these standards, the district court determined that the open areas on campus in which plaintiff seeks permission to conduct a speech represent limited public fora. The district court

- 15 -

relied heavily on the reasoning employed in *Bowman v. White*, 444 F.3d 967, 978 (8th Cir. 2006),

in connection with campus property at the University of Arkansas:

> In the case of the University, although it "possesses many of the characteristics of a public forum," such as open sidewalks, "[it] differs in significant respects from public forums such as streets or parks or even municipal theaters." *Widmar v. Vincent,* 454 U.S. 263, 268 n. 5, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). A university's purpose, its traditional use, and the government's intent with respect to the property is quite different because a university's function is not to provide a forum for all persons to talk about all topics at all times. Rather, a university's mission is education and the search for knowledge—to serve as a "'special type of enclave' devoted to higher education." *ACLU Student Chapter-Univ. of Md., College Park v. Mote,* 321 F.Supp.2d 670, 679 (D. Md. 2004) (quoting [*United States v.*] *Grace*, 461 U.S. [171] at 180, 103 S.Ct. 1702 [(1983)]); *see Widmar,* 454 U.S. at 268 n. 5, 102 S.Ct. 269 ("We have not held, for example, that a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings."). Thus, streets, sidewalks, and other open areas that might otherwise be traditional public fora may be treated differently when they fall within the boundaries of the University's vast campus.

Opinion and order pp. 11-12, JA 114-15. The *Bowman* court went on to hold that open areas

analogous to those in which plaintiff seeks permission to speak at Miami University were "unlimited

designated public fora," i.e., areas where the University of Arkansas (1) had permitted university

entities and non-university entities to speak; (2) had given preferential treatment to university

entities; and (3) had not intended to limit the use to a particular type of speech or speaker.

A similar result was reached, the district court noted, in *Gilles v. Blanchard*, where the

Seventh Circuit addressed a similar challenge to a speech-limiting policy of Vincennes University.

In connection with a campus public area known as the library lawn, the court held that the university

was within its rights to limit access to outside speakers based on content-neutral criteria:

> No matter how wonderfully suited the library lawn is to religious and other advocacy, Vincennes University could if it wanted bar access to the lawn to any outsider who wanted to use it for any purpose, just as it could bar outsiders from its classrooms, libraries, dining halls, and dormitories. It wouldn't have to prove that allowing them in would disrupt its educational mission. *See American Civil Liberties Union v. Mote,* 423 F.3d 438, 444 (4th Cir. 2005). "[G]overnment may draw permissible status-based distinctions among different classes of speakers in order to preserve the purpose of the forum, even when the proposed uses by those inside the permitted class of speakers and those outside the permitted class of speakers are quite similar." *Goulart v. Meadows,* 345 F.3d 239, 254 (4th Cir. 2003).

*Gilles v. Blanchard*, 477 F.3d at 470. The court observed that the library lawn was in the nature of a "limited designated public forum," as that term was used in *Bowman*, but deemed the label "an unnecessary flourish." *Id*. at 474. Thus, although the Seventh Circuit refrained from using the "forum analysis template," it recognized the prerogative of the public university to regulate expressive activities in campus public areas in a manner consistent with treatment as a limited public forum. In other words, the Seventh Circuit, like the Eighth Circuit in *Bowman*, rejected the argument that open areas on a public university campus are traditional public fora. *See also American Civil Liberties Union v. Mote*, 423 F.3d 438, 444 (4th Cir. 2005) (holding that University of Maryland campus was a limited public forum); and *Gilles v. Miller*, 501 F. Supp. 2d 939, 948 (W.D. Ky. 2007) (holding that Murray State University campus open areas were designated public fora).

In determining, consistent with these rulings, that Miami University, too, has treated its open areas not as traditional public fora, but as limited public fora, the district court relied on the allegations of plaintiff's complaint. In particular, the court relied on the allegations describing statements made to plaintiff by Lt. Powers and Robin Parker explaining that the university had

- 17 -

exercised its prerogative, consistent with its educational mission, to limit expressive activities in campus public areas. The court noted that plaintiff had not attempted to refute these characterizations of university policy.

On appeal, plaintiff maintains that open areas on a public university campus must be considered traditional public fora and that the university's intent to limit expression is not determinative of the nature of the forum. In support, he relies on case law defining the general parameters of forum analysis, but has identified precious little authority for the proposition that campus property is a traditional public forum. He relies heavily on Judge Bye's concurring opinion in *Bowman*, 444 F.3d at 983-91. Judge Bye would have concluded that open areas on the University of Arkansas campus were traditional public fora. While Judge Bye made a principled argument, it did not prevail, but was rejected by the majority. Moreover, the principled distinction he drew proved to be of little practical consequence, as Judge Bye joined the majority in substantially upholding the university's regulation of speech in the subject areas.

Plaintiff also relies on *Brister v. Faulkner*, 214 F.3d 675 (5th Cir. 2000). In *Brister*, the Fifth Circuit considered University of Texas property adjacent to and contiguous with a City of Austin public sidewalk, where university policy prohibited all leafleting by non-students. The district court had awarded the plaintiffs declaratory relief, holding that the subject area was a traditional public forum because it was indistinguishable from the city sidewalk. Noting that public sidewalks are, by long tradition, public fora, the Fifth Circuit affirmed, based on the "very specific facts" of the case, involving "a unique piece of university property that is, for all constitutional purposes, indistinguishable from the Austin city sidewalk." *Id*. at 683.

The sort of specific and unique facts that formed the premises of the *Brister* ruling have not been alleged in this case. Plaintiff has not alleged that the Academic Quad or any other open area where he would conduct a speech at Miami University is so contiguous with, and free of visible demarcation from, a city sidewalk or street as to be indistinguishable from it. Indeed, the *Brister* ruling is manifestly narrow, affirming a very limited award of declaratory relief (where injunctive and compensatory relief were denied) and closely tied to its specific and unique facts. Subsequently, the Fifth Circuit has held, in connection with another challenge to the University of Texas leafleting policy, that open areas on campus generally accessible to students are not traditional public forums, but "designated public forums." *Justice for All v. Faulkner*, 410 F.3d 760, 769 (5th Cir. 2005).

Plaintiff has failed to persuade us to depart from the great weight of authority, which has rejected the notion that open areas on a public university campus are traditional public fora. Accordingly, we find no error in the district court's determination that the subject open areas at Miami University represent limited public fora.

### 2. *Content-Neutral and Reasonable?*

The district court concluded that Miami University's regulation of speech in a limited public forum is permissible as long as it is content-neutral and reasonable in light of the purpose served by the forum. *See Good News Club v. Milford Central School*, 533 U.S. 98, 106-07 (2001).[6] The district court held the speech policy student-sponsorship requirement, as described in the Parker letter, is content-neutral on its face, as it applies to all visitors who would conduct a speech on

---

[6]Any content-based restriction would have to be narrowly drawn to effectuate a compelling governmental interest. *Kincaid*, 236 F.3d at 348.

- 19 -

campus. Further, the court held that the requirement is reasonably related to the university's educational mission in that it limits on-campus speeches by visitors to matters in which at least one group of students is interested. Accordingly, the court concluded that, to the extent the complaint could be construed as challenging the speech policy, it failed to state any impermissible infringement of free speech rights for which relief could be granted.

Indeed, analogous student sponsorship requirements have been upheld as reasonable restrictions on speech. *See Gilles v. Blanchard*, 477 F.3d 472-74 (upholding student-sponsorship requirement as a decentralizing invitation process that assures nondiscrimination and a reasonable diversity of viewpoints consistent with the university's autonomy); *Bowman*, 444 F.3d at 980-81 (upholding content-neutral permit requirement as narrowly tailored to ensure public safety, minimize disruption of the educational setting, and allow for coordination of use of limited space by multiple entities); *Gilles v. Miller*, 501 F. Supp. 2d at 948-49 (upholding student-sponsorship requirement as content-neutral and reasonable).

Plaintiff does not directly challenge the district court's rulings in this regard. Instead, he argues that the speech policy, as applied to him, amounts to a perpetual ban—inasmuch as he has been unable to secure sponsorship—for which there is no justification. Yet, as the district court observed, the fact that plaintiff has not yet obtained sponsorship does not in itself evidence viewpoint discrimination or lack of a reasonable relationship between the restriction and the university's educational mission:

> The policy is content-neutral on its face. Furthermore, the Complaint is devoid of any factual allegations that the student sponsorship requirement results in viewpoint discrimination as applied. The complaint does not allege that a condition of being

a registered student organization is having no viewpoint associated with the Plaintiff. *See Bourgault v. Yudof*, 316 F. Supp. 2d 411, 420 (N.D. Tex. 2004). Moreover, even if there is no student organization that will agree to sponsor Plaintiff's speech, Plaintiff fails to allege any facts which establish MU prohibits student groups holding views similar to Plaintiff's views. As discussed by the *Bourgault* court:

> There is no evidence or allegation that student organizations are only permitted . . . if they hold certain beliefs, or that students would be prohibited from forming an organization because of their viewpoint on a particular topic. There is no reason for the court to believe that students . . . cannot form an organization regardless of their viewpoints.

Opinion and order p. 14, JA 117. *See also Gilles v. Miller*, 501 F. Supp. 2d at 948-49 (applying same reasoning).

Plaintiff has not refuted this reasoning. That is, despite the fact that he has allegedly been unable to secure an invitation, he has not alleged or otherwise demonstrated that the sponsorship requirement is not content-neutral or not reasonably related to the university's educational mission. As the Seventh Circuit has noted, "the Constitution does not commit a university that allows a faculty member or student group to invite a professor of theology to give a talk on campus also to invite Brother Jim and anyone else who would like to use, however worthily, the university's facilities as his soapbox." *Gilles v. Blanchard*, 477 F.3d at 474.

Nevertheless, inasmuch as we have concluded that plaintiff's due process vagueness challenge is not facially meritless and that further proceedings are warranted to define the contours of the unwritten speech policy and its operation, we are loath to conclude that plaintiff undoubtedly can prove no set of facts consistent with his allegations that would entitle him to relief under his free speech claim. Because the policy remains ill-defined, we are unwilling to conclude at this stage that

plaintiff's claim necessarily must fail. Notwithstanding our impression that proof of plaintiff's free speech claim is improbable and recovery unlikely, the claim is well-enough pleaded to withstand scrutiny under Rule 12(b)(6). *See Twombley*, 127 S.Ct. at 1965 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'") (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Accordingly, the district court's order dismissing the free speech claim shall, to this extent, also be vacated.

### E. Preliminary Injunction

To the extent that dismissal of his claims is reversed, plaintiff asks us to address the motion for preliminary injunction filed in the district court on April 1, 2005. In response, defendants correctly argue that they never had the opportunity to respond to the motion in the district court, that the record was never completed, and that the district court never ruled on it. The motion for preliminary injunction is not properly before us; it can be addressed by the district court after remand, if there is still a live controversy between the parties.[7]

### III. CONCLUSION

For the foregoing reasons, the district court's dismissal of plaintiff's free speech and due process claims is, to the extent they challenge the university speech policy, **VACATED**, and this matter is **REMANDED** to the district court for further proceedings consistent with this opinion.

---

[7]Similarly, defendants' request that Lt. Powers be granted qualified immunity is deferred. Although the defense was raised in defendants' motion to dismiss, the district court did not reach it. The question of qualified immunity, too, shall be addressed by the district court in the first instance.

**KAREN NELSON MOORE, Circuit Judge, concurring in the judgment.** I concur in the judgment of the majority opinion because I agree that the questions of fact surrounding the content and parameters of Miami University's ill-defined speech policy require us to reverse the district court's dismissal of this case pursuant to Federal Rule of Civil Procedure 12(b)(6). I write separately because I believe that the majority opinion decides more than is necessary or advisable in reviewing the grant of Miami University's motion to dismiss.

The majority opinion holds that the district court did not err in determining that the open areas at Miami University constitute limited public fora. I believe that it is not necessary for us to reach this holding and that doing so requires glossing over complex, mixed questions of law and fact that are better considered once the record in this case is developed. The majority does not address the distinction between a limited public forum, also known as a limited designated public forum, and a designated public forum, also known as a true or unlimited designated public forum. The Fifth Circuit has explained that "the Supreme Court at one time 'referred to limited public forums as being a subcategory within a designated public forum', but had more recently 'used the phrase limited public forum to describe a type of nonpublic forum of limited open access.'" *Justice For All v. Faulkner*, 410 F.3d 760, n.6 (5th Cir. 2005) (quoting *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 n.10 (5th Cir. 2001)). The Eighth Circuit conducts a similar analysis, explaining that a limited public forum is open to certain categories of speakers and subjects while a designated public forum is not similarly limited. *Bowman v. White*, 444 F.3d 967, 976 (8th Cir. 2006). The distinction is important because our sister circuits have held that restrictions on speech in a limited public forum are allowed if they are content-neutral and reasonable, while restrictions in a designated public forum

must be analyzed under the strict-scrutiny standard. *Id.*; *see also Justice For All*, 410 F.3d at 765-66.

Dicta in one of our own prior opinions did not delineate any distinction between a limited public forum and a designated public forum, but the decision involved the forum analysis applicable to a student yearbook and not the open areas of the physical university campus. *Kincaid v. Gibson*, 236 F.3d 342, 348 (6th Cir. 2001). We have yet to decide whether open campus areas may constitute either a designated or limited public forum and whether the distinction bears consequences for the constitutionality of speech restrictions.

The majority is correct that the clear weight of authority rejects the notion that open areas on university campuses are traditional public fora. The majority slights the fact, however, that our sister circuits have taken varying approaches to determining exactly what kind of fora these campus areas constitute. Only the Fourth Circuit has held that open areas on a university campus amount to a limited public forum, in which restrictions on the class of "external" speakers are subject to the deferential standard requiring only that the restrictions are content-neutral and reasonable. *Am. Civil. Liberties Union v. Mote*, 423 F.3d 438, 444-445 (4th Cir. 2005). The Fifth and Eighth Circuits have held that open areas on university campuses are designated public fora, in which restrictions on speech are subject to strict scrutiny. *Justice For All*, 410 F.3d at 769; *Bowman*, 444 F.3d at 976-80. Finally, while the Seventh Circuit has explained that the First Amendment does not require a public university to invite the same James Gilles who is the plaintiff in this case to give a talk on campus, the Seventh Circuit has rejected forum analysis as the correct approach to resolving the legal issue. *Gilles v. Blanchard*, 477 F.3d 466, 473-74 (7th Cir. 2007).

Answering the question whether the campus areas at issue in this case constitutes a designated public forum, limited public forum, or neither, involves a factual as well as legal analysis. Nathan W. Kellum, *If It Looks Like a Duck . . . Traditional Public Forum Status of Open Areas on Public University Campuses*, 33 HASTINGS CONST. L. Q. 1., 35-36 (2005). I believe that it would be prudent to hold now that the questions regarding the nature of Miami University's speech policy make it inadvisable to dismiss the case and to refrain from determining the forum status of the relevant campus areas at this early stage of litigation before the record is further developed.